KATHRYN WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
PETER DEL GRECO (Cal. Bar No. 164925)
Email: delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>RYAN GINSTER,<br><br>　　　　Defendant. | Case No. 5:21-cv-01957<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Ginster resides in this district.

## SUMMARY

4. This action involves two consecutive, and virtually identical, unregistered offering frauds orchestrated by Defendant Ryan Ginster ("Ginster") under the names Social Profimatic ("SP") and MyMicroProfits.com ("MMP"). Since at least March 2018 through March 2021, Ginster has raised over $3.6 million between the two frauds, all of it in Bitcoin ("BTC").

5. Ginster did business under the names of both SP and MMP, neither of which existed as a separate entity. Both allegedly ran online high yield investment programs ("HYIPs") that promised investors astronomical rates of return in a short period of time. In both schemes, Ginster misrepresented how investor funds would be used and how easily those funds could be withdrawn.

6. For example, in his SP scheme, from February to March 2018, Ginster

promised returns of 8% a day, and raised approximately $844,667 in BTC at then prevailing prices. The corresponding effective annual rate Ginster offered – meaning the yearly rate of interest on the investment after daily compounding – amounted to an astronomical return of 1,583,692,108,826%. To generate these returns, Ginster claimed that SP would create and fulfill "social media marketing orders." Once SP received investors' BTC, Ginster transferred the funds to and amongst at least five other digital asset wallets under his control, as well as converting BTC to fiat currency to pay his personal expenses. On information and belief, these transfers do not indicate that Ginster ever attempted to generate returns on the BTC through social media marketing orders as promised.

7. In his MMP scheme, from June 2020 through March 2021, Ginster promised returns of 0.13% per hour (or 3.12% per day), and raised almost $2.8 million in BTC at then prevailing prices. If these returns had actually been obtained by an investor investing a mere $10 on June 1, 2020, by March 1, 2021 that single two-digit investment would be worth $44,938.65. In order to generate these fantastically huge returns, Ginster claimed MMP would invest in micro profit opportunities such as "transaction processing fees, cloud hosting, cryptocurrency trading and advertising arbitrage." Once MMP received investors' BTC, Ginster transferred the funds to and amongst at least five other digital asset wallets under his control, as well as converting BTC to fiat currency to pay his personal expenses. On information and belief, these transfers do not indicate that Ginster ever attempted to generate returns on the BTC through transaction processing fees, cloud hosting, cryptocurrency trading and advertising arbitrage.

8. While both SP and MMP touted to investors that their returns could be withdrawn easily, investors in both schemes were ultimately unable to withdraw their funds.

9. Between at least February 2018 through February 2021, Ginster also transferred BTC from the SP and MMP digital asset wallets to his own personal

digital asset wallets and then subsequently converted portions of that BTC into more than $1 million in U.S. currency. Ginster spent the vast majority of these U.S. dollars on personal expenses such as tax payments, mortgage payments, a luxury vehicle, and almost $200,000 in various credit card bills.

10. Through this conduct, and as further detailed below, Ginster violated the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as the registration provisions of Sections 5(a) and 5(c) of the Securities Act.

11. The SEC seeks findings that Ginster committed these violations; permanent injunctions against Ginster's future violations of the securities laws; a permanent injunction precluding Ginster from participating in unregistered securities offering; disgorgement with prejudgment interest; and a civil monetary penalty.

## DEFENDANT

12. **Ryan Ginster, a/k/a Ryan Oakley ("Ginster")**, age 34, is a resident of Corona, California. Ginster created and controls the SP and MMP websites. Ginster has never been registered or associated with a Commission registrant in any capacity or held any securities licenses. Ginster used at least one alias to promote his HYIPs. Ginster did business as SP and MMP, neither of which is an actual legal entity. Neither SP nor MMP are registered with the SEC, and neither has registered any offerings of securities.

## THE FRAUD

A. **Background on Digital Assets**

13. The term "digital asset" or "digital token" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens." Bitcoin ("BTC") is one such digital asset.

14. A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically

unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

15. A digital asset like BTC can be converted to U.S. dollars. However, the U.S. dollar exchange rate for digital assets fluctuates over time.

**B.     Ginster Creates Two Similar Fraudulent Offerings: SP and MMP**

16. Between on or about February 2018 and March 2021, Ginster created, operated, and profited from at least two separate schemes, the SP HYIP and the MMP HYIP.

17. The SP and MMP HYIPs were securities in the form of investment contracts.

18. In each offering, investors' funds were pooled together in digital asset wallets controlled by Ginster, with the promise of very high returns, to be garnered entirely through Ginster's purported efforts on behalf of SP and MMP.

<u>The Social Profimatic Offering</u>

19. First, on or about February 18, 2018, Ginster purchased and registered the domain name https://socialprofimatic.com and began promoting the SP offering on the website.

20. On or about February 26, 2018, Ginster, using the alias Ryan Oakley, emailed a company selling HYIP software to purchase the software to allow investors to buy into the SP website using "other alt coins."

21. SP's website described its operations as follows: "[y]ou choose how much you wish to deposit with us & we'll pay you 8% every day. Our system will divide your revenue share payments up by the hour so you receive INSTANT and AUTOMATIC payments each hour. After you have your deposit made, we start creating & fulfilling social media marketing orders behind the scenes day & night on your behalf!"

22. The SP website advertised a $10 USD investment minimum, claiming "[i]t won't cost you an arm or a leg either, you can start making money with as little

as $10."

23. By early February 2018, Ginster, as SP, was sending emails promoting the offering, emphasizing the passivity of the investment and the ease of withdrawal of profits.

24. For example, a February 22, 2018 SP email states: "[i]t's a brand new earner that pays you every 60 minutes while you relax and do what you enjoy most."

25. The same February 22, 2018 SP email states: "[y]ou can get job replacing income paid to you every hour and access it INSTANTLY via your favorite e-currency."

26. As another example, a February 26, 2018 SP email states: "[i]t's so easy, get paid an easy 8% daily without lifting a finger."

27. The same February 26, 2018 SP email states: "[i]t's 100% passive. Which means sit back and let their system do the work."

28. In a similar March 13, 2018 email, SP again described its business, without providing any detail of how money was actually generated, saying: "Our business pays you from ACTUAL BUSINESS and SALES revenue which means you're essentially a part owner of our business without all of the headache!"

29. The SP website directed prospective investors to send their investments to SP's BTC wallet which was maintained by Ginster.

30. Between February 21 and March 31, 2018, there were over 9,000 separate BTC investor deposits that were pooled together in SP's digital asset wallet, totaling 98.12 BTC, which had a fiat value of approximately $845,000 at that time. Most of these deposits were in two and three figure fiat sums.

31. Between February 21 and October 2, 2018, there were at least 12,840 withdrawals totaling approximately $818,778 in fiat currency at that time from SP's wallet.

32. The SP investments were passive, in that investors' promised returns were based upon Ginster's alleged efforts on behalf of SP.

33. Ginster had access to and controlled the SP digital asset wallet, and the access code for this wallet was in his possession.

### The MyMicroProfits Offering

34. Approximately two years after the SP HYIP, on or about March 5, 2020, Ginster, again using the alias Ryan Oakley, commenced a virtually identical offering. He emailed the same company that sold HYIP software to purchase additional HYIP software for mymicroprofits.com.

35. Ginster then purchased and registered the domain name "mymicroprofits.com" on or about June 5, 2020, and activated the MMP website.

36. Beginning in or around June 2020 Ginster also promoted MMP to prospective investors in a series of videos released publicly on YouTube.

37. On both the MMP website and on the YouTube videos, MMP claimed that it would pay investors 0.13% per hour (or 3.12% per day), without any effort by the investor.

38. In a video embedded on MMP's website, Ginster claims that MMP "specializes in 4 different types of Micro Profit Opportunities - transaction processing fees, cloud hosting, cryptocurrency trading, and advertising arbitrage." The video did not state how MMP, and thus investors, would profit from these alleged ventures.

39. The MMP website stated "It's very important for you to know that we are a REAL BUSINESS and THAT OUR SUCCESS IS TIED TO YOURS.  We want to keep paying you forever because that means we GET PAID FOREVER TOO!"

40. In an undated handwritten note to himself, Ginster states that the "proof of concept" for the "Microprofit" system would have a "program that checks total deposits each day and then puts together random report[sic] to show income generated[.]"

41. In order to invest, MMP investors were directed to send their investments to a BTC wallet maintained by Ginster on behalf of MMP, where the

funds were pooled together.

42. Ginster had access to and controlled the MMP digital asset wallet, and the access code for this wallet was in his possession.

43. The MMP investments were passive, in that investors' promised returns were based upon Ginster's purported efforts on behalf of MMP.

### C. Ginster's Material Misstatements and Other Fraudulent Conduct

44. In offering and selling the SP and MMP securities, Ginster made materially false and misleading statements to investors regarding the offerings.

#### 1. Misstatements Regarding Investment of Funds

45. First, contrary to his representations about how the funds would be invested in order to earn the immense rates of return he promised of 8% a day for SP and over 3% a day for MMP, Ginster did not invest the funds as promised.

46. Transfers in and out of the SP digital asset wallet between February through March 2018 were generally small sum transfers under a $1,000 USD.

47. On information and belief, the number and type of transfers in and out of SP's cryptocurrency wallet are generally not consistent on their face with the types of investment endeavors that would earn 8% returns per day.

48. Transfers in and out of the MMP digital asset wallet from June 2020 through March 2021 were generally small sum transfers under a $1,000 USD.

49. On information and belief, the number and type of transfers in and out of MMP's cryptocurrency wallet are generally not consistent on their face with the types of investment endeavors that would earn 3.12% returns per day.

50. Ginster's false and misleading statements to investors are material. A reasonable investor would have considered it important to know that neither SP nor MMP was investing their funds in a manner consistent with the type of investment endeavor that would generate the enormous profits promised.

### 2. Misstatements Regarding Investors' Ability to Withdraw Funds

51. Second, in both the SP and MMP offerings, Ginster told investors that they could withdraw their funds easily and instantly, but investors were not actually able to do so.

**Social Profimatic**

52. For a time, investors could log onto SP's website and see how the deposits into their individual accounts were purportedly growing.

53. The reported gains however were illusory. For example, one investor ("Investor A") invested $50 in BTC with SP. Subsequently, he logged into his account and saw his investment was allegedly increasing.

54. After a week, Investor A went to withdraw his funds, but the system would not let him access his money, instead requiring him to "reinvest" the profits back into the program. He reinvested as requested and waited.

55. A month after making his investment, Investor A received an email from SP stating that he could now withdraw his funds, which had allegedly grown to $4,000. However, he was never able to withdraw these funds.

56. Investor A contacted SP about the missing funds through email, instant message, and by filling out a form on the website. He never received a reply to any of his inquiries.

57. Approximately a month later, Investor A attempted to load the SP website, and found the website had disappeared.

58. Another investor ("Investor B") invested approximately $20 in order to test whether SP would actually allow withdrawals of profit. He was able to withdraw this initial investment plus profit, so he invested additional funds.

59. Ultimately however, after this first investment, Investor B found that the SP website disappeared and he lost most of the money he invested.

**MyMicroProfits**

60. Similarly, for a time, investors could log onto MMP's website and see how the deposits into their individual accounts were purportedly growing.

61. The reported gains however were illusory. By mid-August 2020, MMP had ceased making any "profit" payments whatsoever to its investors.

62. For example, one investor ("Investor C") learned about MMP from videos he saw on YouTube and decided to invest $400.

63. Investor C was able to go to the MMP website and see that the balance in his account was supposedly growing. However, when Investor C went to withdraw his funds, he was only able to take out $150.

64. Ultimately, Investor C found that merely a few days after his initial investment, the website stopped functioning and reported an "error" and would not let him communicate with the website or withdraw the rest of his funds.

65. Ginster's false and misleading statements to investors about their ability to withdraw their funds are material. A reasonable investor would have considered it important to know that they could not withdraw their funds from either SP or MMP upon request.

### 3.   Ginster's Misuse and Misappropriation of Investors' Funds

66. Third, contrary to his assertions about how investor funds would be used to generate profits for investors in both SP and MMP, Ginster actually misappropriated substantial sums for his personal use.

**Social Profimatic**

67. By March 26, 2018, Ginster ultimately transferred 24.78 BTC – more than one-fourth of the total amount raised in SP – with a fiat value of more than $215,000 at that time – to his personal wallet at Coinbase, which is an online platform on which to buy, sell, and store digital assets.

68. Between March 5 and March 26, 2018, Ginster converted some of the BTC in his personal Coinbase wallet to approximately $137,432 in U.S. currency and

9

transferred the funds to a traditional bank account he controlled at Carrollton Bank (the "Carrollton Account").

69. By March 31, 2018 Ginster also transferred from the SP wallet a total of 23.33 BTC, with a value of more than $172,000 in U.S. currency at that time, to wallets Ginster controlled at three other digital asset platforms.

### MyMicroProfits

70. Between June 5, 2020 and March 19, 2021, there were at least 9,916 separate BTC investor deposits that were pooled together in MMP's digital asset wallet, totaling $2,798,358 in fiat value at the time of their deposit. The majority of these deposits occurred between June and August of 2020.

71. Between June 8 and September 14, 2020, Ginster transferred about one third of the BTC deposited into the MMP wallet to other digital asset wallets under Ginster's control.

72. Subsequently, Ginster converted some of the BTC in the wallets he controlled into approximately $909,043 of U.S. currency, and transferred that sum to the Carrollton Account that he controlled.

### Ginster's Use of Funds from the Carrollton Bank Account

73. Between at least June 2020 and February 2021, Ginster used the funds in his personal Carrollton Account in at least the following ways:

    (a)    $213,250 to E*Trade Account;

    (b)    $152,797 to American Express Card Services;

    (c)    $131,097 to the Internal Revenue Service;

    (d)    $35,059 to the Franchise Tax Board;

    (e)    $34,395 to pay Discover Card;

    (f)    $30,254 to Mercedes Benz;

    (g)    $20,670 to United Wholesale Loan;

    (h)    $20,000 to Lending Club; and

    (i)    $7,608 to Capital One Card.

74. Ginster's false and misleading statements to investors regarding the use of investor funds are material. A reasonable investor would have considered it important to know that Ginster was misappropriating their investment funds.

**D.   Ginster Engaged in a Fraudulent Scheme**

75. In addition to making material misrepresentations to investors, Ginster engaged in a fraudulent scheme as to both the SP and MMP offerings.

76. First, Ginster led investors to believe their investments in both SP and MMP were making money with fake online returns.

77. For example, Investor B was able to withdraw his first investment in SP plus profit, leading him to reinvest in SP.

78. Similarly, Investor C reviewed the MMP website, where he saw that his account was supposedly growing in value even though he was ultimately unable to withdraw his full investment and alleged profit.

79. Second, Ginster also made up excuses for the lack of returns and inability to withdraw funds by claiming technical issues to complaining investors.

80. Third, Ginster misappropriated investor funds for his personal use, including the more than $1 million worth of BTC that Ginster converted to U.S. currency. Under the terms of the investments as described on the SP and MMP websites, nothing suggests that Ginster has any legitimate claim to these funds.

81. Fourth, Ginster used at least one alias, Ryan Oakley, to conceal his identity in operating SP and MMP.

**E.   Ginster Acted With a High Level of Scienter, or in the Alternative, Was Negligent**

82. Ginster acted with a high level of scienter.

83. Ginster was the sole control person of SP and MMP.

84. Ginster managed operations for both SP and MMP.

85. Ginster controlled SP and MMP's digital asset wallets where investor funds were both deposited and from where they were disbursed.

86. Ginster knew that investor monies were not being used to generate the returns necessary to finance his promised rates of return for either SP or MMP.

87. Similarly, Ginster knew that a substantial portion of investor funds were being diverted from SP and MMP's digital asset wallets to wallets and bank accounts that Ginster personally controlled.

88. Ginster knew, or acted recklessly in not knowing, that: (1) MMP and SP lacked any ability to generate the returns promised from the moment their websites went operational; (2) that investor monies were not being used in a manner that might generate the promised investment returns; and, (3) that investors would never be able to take possession of their phantom returns nor receive the return of their principal.

89. Alternatively, Ginster failed to exercise reasonable care as to whether: (1) MMP and SP had any ability to generate the returns promised from the moment their websites went operational; (2) investor monies were being used in a manner that might generate the promised investment returns; and, (3) investors would ever be able to take possession of their phantom returns or receive the return of their principal.

**F.  Ginster's Registration Violations**

90. Ginster offered and sold securities in the form of SP and MMP investment contracts by directly controlling the websites on which SP and MMP promoted, offered, and sold securities, as well as the online wallet into which investors deposited their investment funds.

91. SP and MMP's offerings of investment contracts were not registered with the SEC, and no exemption from registration applied to the offerings.

92. Ginster engaged in a general solicitation for investors by conducting the offerings solely through the internet, via SP and MMP's websites, through YouTube videos, and through the use of online digital asset wallets into which investors made their deposits.

93. Ginster offered and sold SP and MMP's securities to residents of numerous states.

94. Ginster did not take any reasonable steps to verify the accredited status of the SP and MMP investors.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Ginster)**

95. The SEC realleges and incorporates by reference paragraphs 1 through 94 above.

96. As set forth above, Defendant Ginster made several material misrepresentations, and omitted material information, to SP and MMP's investors, including: not investing investor funds as promised; assuring both SP and MMP investors that they would be able to withdraw their earnings "easily" and "instantly," when investors were not actually able to do so; and, misappropriating funds for his own use contrary to his representations to investors about how money would be invested.

97. In addition, Defendant Ginster engaged in a scheme to defraud whereby he led investors to believe their investments were making money with fake online returns; he made up excuses for the lack of returns and inability to withdraw funds by claiming technical issues to complaining investors; and misappropriated investor funds for his personal use.

98. By engaging in the conduct described above, Defendant Ginster, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or
13

courses of business which operated or would operate as a fraud or deceit upon other persons.

99. By engaging in the conduct described above, Defendant Ginster violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act
### (Against Ginster)

100. The SEC realleges and incorporates by reference paragraphs 1 through 94 above.

101. By engaging in the conduct described above, Defendant Ginster obtained money or property by means of false statements to investors in connection with the offer or sale of investments in SP and MMP, and omitted to disclose material information about SP and MMP.

102. In addition, Defendant Ginster engaged in a scheme to defraud whereby he led investors to believe their investments were making money with fake online returns; he made up excuses for the lack of returns and inability to withdraw funds by claiming technical issues to complaining investors; and misappropriated investor funds for his personal use.

103. By engaging in the conduct described above, Defendant Ginster, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or

courses of business which operated or would operate as a fraud or deceit upon the purchaser.

104. Defendant Ginster, with scienter, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In the alternative, Defendant Ginster was negligent.

105. By engaging in the conduct described above, Defendant Ginster violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against Ginster)**

106. The SEC realleges and incorporates by reference paragraphs 1 through 94 above.

107. The SP and MMP offerings involved the offer and sale of securities in the form of investment contracts.

108. Neither the SP nor MMP offerings were registered with the SEC.

109. Ginster directly and indirectly offered and sold the SP and MMP securities because he controlled the websites on which SP and MMP promoted, offered and sold their securities, as well as the online wallets into which investors deposited their investor funds.

110. Ginster conducted the offerings of SP and MMP securities through the internet, via SP and MMP's websites, videos that MMP circulated on YouTube, and through the use of digital asset wallets into which investors made their deposits.

111. By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendant Ginster, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of

1 the mails to sell securities through the use of means of a prospectus, and (b) made use
2 of the means and instruments of transportation or communication in interstate
3 commerce and of the mails to offer to sell through the use of a prospectus, securities
4 as to which no registration statement had been filed.

5     112. By reason of the foregoing, Defendant directly or indirectly violated, and
6 unless restrained and enjoined, will continue to violate, Sections 5(a) and (c) of the
7 Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue a judgment, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a).]

### III.

Issue a judgment, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Issue an order permanently enjoining Defendant Ginster from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal account.

### V.

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### VI.

Order Defendant to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: November 18, 2021

/s/ *Kathryn Wanner*
Kathryn Wanner
Peter Del Greco
Attorneys for Plaintiff
Securities and Exchange Commission